Slip Op. 20–143

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
BOURGAULT INDUSTRIES, LTD.,    :
:
          Plaintiff,    :
:      Before: Richard K. Eaton, Judge
    v.    :
:      Court No. 19-00111
UNITED STATES,    :
:
          Defendant.    :
_____:

## OPINION

[United States Department of Commerce's final scope ruling sustained.]

Dated:  October 13, 2020

*George W. Thompson*, Thompson & Associates, PLLC, of Washington, DC, argued for Plaintiff.

*Kelly A. Krystyniak*, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *L. Misha Preheim*, Assistant Director. Of Counsel on the brief was *James Henry Ahrens II*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

Eaton, Judge: This case involves a challenge to the United States Department of Commerce's ("Commerce" or the "Department") ruling that the coulter disc hubs imported by Bourgault Industries, Ltd. ("Bourgault" or "Plaintiff") are "tapered roller housings" within the scope of the antidumping duty order on tapered roller bearings from the People's Republic of China ("Order").[1] *See Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof,*

---

[1]    *See Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Rep. of China*, 52 Fed. Reg. 22,667 (Dep't Commerce June 15, 1987) (original final antidumping duty order) *amended by Tapered Roller Bearings From the People's Rep. of China,*

*Finished and Unfinished, from the People's Rep. of China: Final Scope Ruling on Bourgault Industries Ltd.'s Coulter Disc Hubs* (June 3, 2019), P.R. 18 ("Final Scope Ruling").

Bourgault, a U.S. manufacturer of agricultural equipment, imports coulter disc hubs to make plows. A coulter disc hub "consists of a specialty casted [sic] flange, a specialty designed indexed stub-axle, *generic [tapered roller bearings]*, a crown nut, and a flattened end-cap." Letter from Junker & Nakachi to Sec'y Wilbur Ross (Feb. 19, 2019), P.R. 1 ("Scope Ruling Request") at 2 (emphasis added). Together with a blade, called a coulter disc, the hub is incorporated into an "opener" assembly that is mounted to a plow. The coulter disc is mounted ahead and somewhat above the plow blades. It cuts on an even edge to the furrow, and buries organic material (such as the remains of cut corn stalks) to aid in their decomposition. The hub facilitates the functioning of the disc by resisting the twisting and lateral forces caused when the disc encounters rocks, roots, and other material as it is pulled through the earth. *See* Scope Ruling Request at 3.

The tapered roller bearings inside the coulter disc hub are highly compressed, *i.e.*, they are tightened with what Plaintiff calls "excess preload."[2] *See* Final Scope Ruling at 2. Because of this preload, "coulter disc hubs turn only when sufficient lateral and twisting forces are applied against the coulter blade when engaged with soil." Scope Ruling Request at 4.

Bourgault disputes Commerce's finding that its coulter disc hubs are within the scope of the Order. It argues that (1) prior agency determinations interpreting the Order have identified friction reduction as an "essential function" of in-scope merchandise; and that (2) substantial record evidence shows that its preloaded tapered roller bearings inside the coulter disc hub prevent

---

55 Fed. Reg. 6669 (Dep't Commerce Feb. 26, 1990) (correcting errors in calculated dumping margins).

[2]        As shall be seen, "excess preload" has had two meanings in this proceeding.

the hub from reducing friction; rather, the load *increases* friction. That is, the hub's design ensures that the coulter disc does not rotate, *unless* it is acted upon by sufficient force. *See* Pl.'s Mem. Supp. Mot. J. Admin. R., ECF No. 14 ("Pl.'s Br."); Pl.'s Reply, ECF No. 18. In this way, Plaintiff claims, its coulter disc hubs are different from the "wheel hub units" that Commerce has found to be within the scope of the Order, in previous scope rulings. *See* Pl.'s Br. 20. Plaintiff further argues that if there were any question about the functionality of the coulter disc hubs, Commerce should have commenced a scope inquiry. *See* Pl.'s Br. 27; 19 C.F.R. § 351.225(e), (k)(2) (2019). Plaintiff thus asks the court to remand the Final Scope Ruling to Commerce "for reconsideration and redetermination." Pl.'s Br. 28.

Defendant the United States ("Defendant"), on behalf of Commerce, argues that, like in-scope wheel hub units, coulter disc hubs are "tapered roller housings" (1) under the plain meaning of the Order, and (2) because when sufficient pressure is applied, they do reduce friction. *See* Def.'s Mem. Opp'n Pl.'s Mot. J. Admin. R., ECF No. 16 ("Def.'s Br."). Defendant urges the court to sustain the Final Scope Ruling as supported by substantial evidence and in accordance with law.

Jurisdiction is found under 28 U.S.C. § 1581(c) (2012) and 19 U.S.C. § 1516a(a)(2)(B)(vi) (2012). The Final Scope Ruling is sustained.

## BACKGROUND

### I.    The Order

The cornerstone in a scope determination is the language of the order itself. *Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (citation omitted). On June 15, 1987, Commerce issued the subject Order, which covered:

> tapered roller bearings and parts thereof . . . ; flange, take up cartridge, and hanger units incorporating tapered roller bearings . . . ; and tapered roller housings (except

> pillow blocks) incorporating tapered rollers, with or without spindles, whether or
> not [for] automotive use . . . .

Order, 52 Fed. Reg. at 22,667 (references to Tariff Schedules of the United States omitted). The

Order does not mention functionality or use, except to say that it covered products "whether or

not" they were for "automotive use." For more than thirty years, the Order's language has remained

the same, except for updated references to the tariff schedule. *See Tapered Roller Bearings and*

*Parts Thereof, Finished and Unfinished, From the People's Rep. of China*, 84 Fed. Reg. 6132

(Dep't Commerce Feb. 26, 2019) (final results of thirtieth admin. rev.) (citing the Order). Over the

years, however, Commerce has had occasion to review the scope of the Order, by way of "scope

rulings," which are provided for in its regulations.


## II.       Regulatory Background on Scope Rulings

In a scope determination, "Commerce must first examine the language of the final order."

*Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (citations

omitted). If the language is clear, the plain meaning of the order controls. If the order is ambiguous,

the Department may issue scope rulings "that clarify the scope of an order . . . with respect to

particular products." 19 C.F.R. § 351.225(a). The regulations set out rules regarding scope rulings,

including standards used in determining whether a product is within the scope of an order. *Id.*

Whether an order is ambiguous is a question of law. *See Meridian Prods., LLC v. United States*,

851 F.3d 1375, 1382 (Fed. Cir. 2017).

"[I]n considering whether a particular product is included within the scope of an order . . . ,

[Commerce] will take into account . . . [t]he descriptions of the merchandise contained in the

petition, the initial investigation, and the determinations of [Commerce] (including prior scope

determinations) and the [U.S. International Trade] Commission." 19 C.F.R. § 351.225(k)(1).[3] If

the sources listed in § 351.225(k)(1) are dispositive, Commerce will look no further.

If the (k)(1) sources are not dispositive, Commerce may commence a formal scope inquiry,

in which it will consider additional factors, listed in § 351.225(k)(2): (1) the physical

characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use

of the product, (4) the channels of trade in which the product is sold, and (5) the manner in which

the product is advertised and displayed. 19 C.F.R. § 351.225(k)(2), (e).


### III.    The Petition

On August 25, 1986, The Timken Company ("Timken")[4] filed a petition, on behalf of the

U.S. tapered roller bearing industry, alleging that imports of tapered roller bearings from China

were being, or were likely to be, sold at less than fair value in the United States, and were causing,

or threatened to cause, material injury to the U.S. industry. The petition stated that it covered "the

full range of [tapered roller bearings]":

> The scope of the petition includes the full range of TRBs[5], including single-row bearings made with various angles and roller lengths and multiple-row bearing assemblies. These bearings are available in two-row and four-row assemblies and used where greater bearing rating is needed. Thrust bearings and self-contained bearing packages (sometimes referred to as "unitized" bearings) are also included.

---

[3]     The regulations set out different scope determination procedures for "products completed or assembled" in the United States or foreign countries other than a country to which an order applies, products with minor alterations, and later-developed products, none of which apply here. *See* 19 C.F.R. § 351.225(g)-(j).

[4]     Timken is not a party to this lawsuit, but it participated in the scope ruling proceeding before Commerce.

[5]     "TRBs" means tapered roller bearings.

Letter from Stewart and Stewart to Sec'y Wilbur Ross (Mar. 25, 2019), P.R. 7-9 ("Timken

Opp'n"), Attach. 2 at 9 (excerpts from petition). Unlike the eventual Order itself, the petition

identified different purposes for which tapered roller bearings could be used, including agricultural

and industrial applications. *See* Timken Opp'n, Attach. 2.

Products identified in the petition included tapered roller bearings with different "settings,"

*i.e.*, "a specific amount of play or preload." Letter from Junker & Nakachi to Sec'y Wilbur Ross

(May 19, 2019), P.R. 15 ("Bourgault Rebuttal"), Ex. C at 2. For example, a Timken brochure

attached to the petition described, *inter alia*, two types of preloaded tapered roller bearings—the

"Hydra-Rib" and the "Spring-Rib":

> [The Hydra-Rib] is a self-contained tapered roller bearing that has a floating outer
> race (or cup) rib which contacts the rollers. The floating rib is controlled by
> hydraulic or pneumatic pressure in the sealed chamber behind the rib. Variable
> pressure capabilities provide the unique capability of changing the preload in the
> system to handle variable load or speed situations. This bearing is designed for
> applications where bearing adjustment is critical over [a] wide range of speeds or
> loads.

> [The Spring-Rib] is a self-contained tapered roller bearing that has a floating outer
> race (or cup) rib which contacts the rollers. The floating rib is controlled by springs.
> This bearing is available in three grades of preload. They are light[,] medium and
> heavy preload. The amount of preload is determined by the number of springs used
> in the assembly. Use this bearing only where load and speed conditions are
> relatively constant.

Timken Opp'n at 8-9 (quoting Timken brochure in Collective Ex. 3). In other words, Timken

sought investigation of tapered roller bearings with different grades of preload. As explained by a

Timken engineer in a declaration attached to the petition:

> All tapered roller bearings use settings to optimize bearing performance which are
> either specific amounts of axial end play or axial preload adjusted at assembly to
> control the internal clearances between the rolling elements and the inner and outer
> rings' contacting races. . . . *Preload is an axial interference or light compression
> between rollers and races such that there is no measurable axial shaft movement
> when a small force is applied. A preloaded [tapered roller bearing] has no internal*

> *clearance (measured either axially or radially) between the bearing's rolling*
> *elements and its inner and out[er] races.*

Timken Opp'n, Attach. 4 ¶ 7 (emphasis added). Thus, preload is a common feature of tapered

roller bearings.

Bourgault notes that the petition addressed "excessive preload" in the context of how a

bearing's setting impacts its useful life:

> Some applications are set with preload to increase rigidity and positioning of highly
> stressed parts that would otherwise be dramatically affected by excessive deflection
> and misalignment.
>
> *Excessive preload must be avoided as bearing fatigue life can be drastically*
> *reduced.* Also, excessive preload can lead to lubrication problems and premature
> bearing damage due to high operating temperature.

Bourgault Rebuttal, Ex. C at 2 (Timken's Bearing Setting Techniques Manual) (emphasis added).

It is worth noting that the word excessive in this context is used in the sense of "too

much"—not in the sense of a "large amount." That is, the Timken manual quoted by Bourgault

was warning that too much preload would cause the bearings to wear out.

## IV.     The Initial Investigation

In response to Timken's petition, Commerce initiated a dumping investigation. *See*

*Tapered Roller Bearings, Rollers and Parts Thereof, Finished or Unfinished, From the People's*

*Rep. of China*, 51 Fed. Reg. 33,283 (Dep't Commerce Sept. 19, 1986) (notice of initiation). In its

preliminary determination, Commerce defined the scope of the investigation, which would later

be reflected in the Order:

> tapered roller bearings and parts thereof . . . ; flange, take up cartridge, and hanger
> units incorporating tapered roller bearings . . . ; and tapered roller housings (except
> pillow blocks) incorporating tapered rollers, with or without spindles, whether or
> not for automotive use . . . .

*Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, From the People's Rep. of China*, 52 Fed. Reg. 3833 (Dep't Commerce Feb. 6, 1987) (preliminary determination of sales at less than fair value) (references to Tariff Schedules of the United States omitted). The scope of the investigation did not include an inquiry into preload, excessive or otherwise. Commerce made a preliminary determination that dumping was occurring.

Following Commerce's affirmative preliminary determination, the United States International Trade Commission ("Commission") commenced a material injury investigation. The Commission applied Commerce's scope definition.

In its report, the Commission pointed out some differences between ball bearings and tapered roller bearings:

> Tapered roller bearings are a part of the larger product category of antifriction bearings. Antifriction bearings are machine components that permit free motion between moving and fixed parts by holding or guiding the moving parts to minimize friction and wear. In a bearing, a series of rollers or balls are usually mounted in a separation or cage and enclosed between two rings called races. The rolling elements are very important, since they transmit the physical load or force from the moving parts to the stationary support. The two principal types of antifriction bearings are ball bearings and roller bearings, depending on which type of rolling elements [is] employed. Tapered roller bearings are preferred instead of ball bearings for many applications because they are able to *absorb both radial and thrust loads*, unlike ball bearings, which typically withstand only radial force.

*Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, Italy, Japan, the People's Rep. of China, Romania and Yugoslavia*, Inv. Nos. 731-TA-341-346, USITC Pub. 1899 (Oct. 1986) (Prelim.) ("ITC Investigation Preliminary Determination") at A-2 to A-3 & A-3 n.1 (emphasis added) (describing radial loads as "those perpendicular to the axis rotation," and thrust loads as "normally parallel to the level of rotation"). As a result of its investigation, the Commission preliminarily determined that imports of the subject merchandise were causing material injury to the U.S. industry.

Commerce and the Commission confirmed their respective preliminary findings in their final affirmative determinations. *See Tapered Roller Bearings From the People's Rep. of China*, 52 Fed. Reg. 19,748 (Dep't Commerce May 27, 1987) (final determination of sales at less than fair value); *see also Tapered Roller Bearings and Parts Thereof, and Certain Housings Incorporating Tapered Rollers from Hungary, the People's Rep. of China, and Romania*, Inv. Nos. 731-TA-341, -344, -345, USITC Pub. 1983 (June 1987) (Final) ("ITC Investigation Final Determination").

## V.    Prior Scope Determinations

In the Final Scope Ruling, Commerce considered prior scope determinations under the Order, and found that "Bourgault's coulter disc hubs . . . are not substantially different from other hub units Commerce has found to be in-scope merchandise." Final Scope Ruling at 7. In particular, Commerce cited several prior rulings on wheel hub units (also called wheel hub "assemblies"), including a 2011 ruling requested by New Trend Engineering Ltd.[6] *See* Mem. from Wendy J. Frankel, Director, Office 8, Antidumping and Countervailing Duty Operations to Gary Taverman, Acting Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations (Apr. 18, 2011) ("New Trend Scope Ruling").

---

[6]    The New Trend Scope Ruling pertained to splined and non-splined wheel hub units (assemblies) with and without antilock braking sensors. *See* Mem. from Wendy J. Frankel, Director, Office 8, Antidumping and Countervailing Duty Operations to Gary Taverman, Acting Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations (Apr. 18, 2011).

In addition to the New Trend Scope Ruling, Commerce cited other rulings on "hub units" consisting of housed tapered roller bearings which it found to be covered by the Order. *See* Final Scope Ruling at 7 (citing *Tapered Roller Bearings from the People's Rep. of China: Final Scope Determination on Blackstone OTR's Wheel Hub Assemblies* (Feb. 7, 2011) and *Tapered Roller Bearings from the People's Rep. of China: Final Scope Determination on Bosda's Wheel Hub Assemblies* (June 14, 2011)).

In the New Trend Scope Ruling, the merchandise at issue was wheel hub units with and without antilock braking sensors. Commerce undertook an analysis of the § 351.225(k)(2) factors with respect to wheel hub units *with* the sensors, and a § 351.225(k)(1) analysis of those *without* the sensors. Ultimately, Commerce found that wheel hub units, both with and without antilock braking sensors, were "tapered roller housings" because they had flanges that incorporated tapered roller bearings. *See* New Trend Scope Ruling at 5, 10.

Additionally, in the New Trend Scope Ruling, after having considered the (k)(2) factors with respect to wheel hub assemblies with antilock braking sensors, Commerce observed that the wheel hub units' "essential function" was "reducing friction." Specifically, it stated that although the wheel hubs had other features, those features, while adding functionality, "[did] not alter the wheel hub assemblies' essential function of reducing friction." New Trend Scope Ruling at 11. Because it reached this conclusion using a (k)(2) analysis, Commerce necessarily examined the "ultimate use" factor. *See* New Trend Scope Ruling at 8; *see also* Mem. from Wendy J. Frankel, Director, Office 8, Antidumping and Countervailing Duty Operations to Christian Marsh, Deputy Assistant Sec'y for Antidumping and Countervailing Duty Operations (Dec. 8, 2010) at 10 ("Preliminary New Trend Scope Ruling").

This Court sustained Commerce's New Trend Scope Ruling as supported by substantial evidence and in accordance with law in *Power Train Components, Inc. v. United States*, 37 CIT 781, 791, 911 F. Supp. 2d 1338, 1345, 1348 (2013). In its discussion, the Court recited Commerce's finding that the wheel hub assemblies' additional features did not alter their "essential function," *i.e.*, friction reduction. *Id.*, 37 CIT at 785-86, 911 F. Supp. 2d at 1343-44. The Court found no error with respect to that finding.

Finally, in addition to its own prior scope rulings, Commerce took into account a Commission report from the investigation that led to the Order. *See* Final Scope Ruling at 7 & n.44 (citing ITC Investigation Preliminary Determination); *see also* 19 C.F.R. § 351.225(k)(1) ("[Commerce] will take into account . . . [t]he descriptions of the merchandise contained in . . . the determinations of [Commerce] (including prior scope determinations) and the Commission."). Bourgault had cited the Commission report in its brief before the agency to support the argument that the Order only covers tapered roller bearings whose primary purpose is the reduction of friction—an argument that Commerce rejected because there was nothing in the Order that supported it: "The scope language itself does not contemplate that [tapered roller bearings] must be entirely free-turning; to the contrary, the documents in the underlying Petition (as supplemented by a Timken engineer's statement on this scope record) note that [tapered roller bearings] may have different pre-load settings, depending upon their end-use." *See* Final Scope Ruling at 8.[7]

---

[7]      In full text, Commerce stated:

[W]e disagree with Bourgault that the scope requires [tapered roller bearings] to function *solely* to minimize friction and that only [tapered roller bearings] that operate solely to minimize friction are covered by the *Order*. The scope language itself does not contemplate that [tapered roller bearings] must be entirely free-turning; to the contrary, the documents in the underlying Petition (as supplemented by a Timken engineer's statement on this scope record) note that [tapered roller bearings] may have different pre-load settings, depending upon their end-use. In this case, the [tapered roller bearings] are free-turning under the proper load, and, like all [tapered roller bearings], they are optimized to resist lateral and shear forces with even and minimal wear [of the bearings, the hub unit, and coulter disc].

Final Scope Ruling at 8.

## VI.    The Subject Merchandise: Coulter Disc Hubs

As noted, Bourgault's coulter disc hubs "consist[] of a specialty casted [sic] flange, a specialty designed indexed stub-axle, generic [tapered roller bearings], a crown nut, and a flattened end-cap." Scope Ruling Request at 2. Together with a blade (a coulter disc), the hub is incorporated into an "opener" assembly that is mounted to a plow. The disc cuts a crisp line on the furrow and buries organic material. The hub facilitates the functioning of the disc by resisting the twisting and lateral forces caused when the disc encounters rocks, roots, and other material as it is pulled through the earth. When sufficient pressure is applied, however, supposedly by more immoveable objects, the bearing permits the disc to rotate. *See* Scope Ruling Request at 3.

The tapered roller bearings in the coulter disc hub are highly compressed, *i.e.*, according to Plaintiff, they are tightened with "excess preload." *See* Final Scope Ruling at 2. Because of this preload, "coulter disc hubs turn only when sufficient lateral and twisting forces are applied against the coulter blade when engaged with soil." Scope Ruling Request at 4.

## VII.    The Final Scope Ruling Now Before the Court

On February 19, 2019, Bourgault filed its Scope Ruling Request, seeking a determination by Commerce that its coulter disc hubs were outside the scope of the Order. In other words, Bourgault maintained that its products were not:

> tapered roller bearings and parts thereof . . . ; flange, take up cartridge, and hanger units incorporating tapered roller bearings . . . ; and tapered roller housings (except pillow blocks) incorporating tapered rollers, with or without spindles, whether or not [for] automotive use . . . .

Order, 52 Fed. Reg. at 22,667.

In the Final Scope Ruling, Commerce considered the product's description provided by Bourgault in its Scope Ruling Request, *i.e.*:

an indexed spindle (*i.e.*, indexed stub-axle), cotter pin, triple lip seal, tapered roller bearings, hub casting (*i.e.*, casted [sic] flange), a second set of tapered roller bearings, washer, crown nut, and a flattened end-cap.

Final Scope Ruling at 2. It concluded that the product was within the plain language of the Order:

> We find that Bourgault's imported coulter disc hubs meet the physical characteristics of [tapered roller bearings] covered by the scope of the Order, *because they are tapered roller housings incorporating tapered rollers, including a spindle*. Further, there are no exclusions from the order for merchandise which is subject to a different end use, and, in fact, the scope of the Order specifically covers all [tapered roller bearings] and tapered roller housing (except pillow blocks), "whether or not for automotive use." Thus, we find that Bourgault's coulter disc hub units meet the plain language of the scope.

Final Scope Ruling at 6 (emphasis added). In other words, coulter disc hubs fell within the plain meaning of the language of the Order because it was a "tapered roller housing." Commerce specifically found that the end use of the "tapered roller housing" was immaterial to the determination of whether it was covered by the Order.

Commerce reached its determination after conducting a (k)(1) analysis. And although Bourgault argues to the contrary, it is apparent that when reaching its conclusion, Commerce considered the sources of information listed in 19 C.F.R. § 351.225(k)(1).[8] *See* Final Scope Ruling

---

[8]        Subsection 351.225(k) provides:

[I]n considering whether a particular product is included within the scope of an order . . . , [Commerce] will take into account the following:

(1)  The descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the Commission.

(2)  When the above criteria are not dispositive, [Commerce] will further consider:

    (i) The physical characteristics of the product;
    (ii) The expectations of the ultimate purchasers;
    (iii) The ultimate use of the product;
    (iv) The channels of trade in which the product is sold; and
    (v) The manner in which the product is advertised and displayed.

at 6 (citing 19 C.F.R. § 351.225(k)(1)). For instance, Commerce cited its prior scope rulings, in

particular the New Trend Scope Ruling, regarding wheel hub units. It found that Bourgault's

coulter disc hubs were like New Trend's wheel hub units, in that they both housed tapered roller

bearings:

> In [the New Trend Scope Ruling], Commerce found that hub units were covered by
> the Order; this was upheld by the Court in *Power Train Components*. Similarly,
> Commerce also found both automotive and non-automotive hub units, consisting
> of housed [tapered roller bearings], to be covered by the Order in prior scope
> rulings. Thus, we find that there is precedent in our prior consideration of various
> tapered roller housings similar to Bourgault's coulter disc hubs (also consisting of
> [tapered roller bearings]) to support a finding that Bourgault's coulter disc hubs are
> within the scope of the Order.

Final Scope Ruling at 7 (first citing *Power Train Components*, 37 CIT at 787, 911 F. Supp. 2d at

1345; then citing *Tapered Roller Bearings from the People's Rep. of China: Final Scope

Determination on Blackstone OTR's Wheel Hub Assemblies* (Feb. 7, 2011) and *Tapered Roller

Bearings from the People's Rep. of China: Final Scope Determination on Bosda's Wheel Hub

Assemblies* (June 14, 2011)).

The Department acknowledged some differences between Bourgault's coulter disc hubs

and the wheel hub units: "Unlike typical wheel hub assemblies, which principally function as anti-

friction devices, the purpose of the coulter disc hub is to resist the extreme twisting lateral forces,

and jarring impact forces, caused by plowing the soil in a spiral twisting fashion." Final Scope

Ruling at 2. Commerce also recognized that the tapered roller bearings housed within Bourgault's

coulter disc hubs "are tightened with excess preload,[9] which *reduces* the ability of the hub to spin

freely." Final Scope Ruling at 2 (emphasis added). It did not, however, find that the differences

---

19 C.F.R. § 351.225(k)(1)-(2).

[9]      Here, Commerce adopts Plaintiff's use of "excess preload" as "a lot of preload,"
rather than "too much preload."

were material because this preload did not alter the fact that Bourgault's coulter disc hubs contained tapered roller bearings within the plain meaning of the Order.

Commerce also rejected Bourgault's argument that its coulter disc hubs were not in-scope, because their "essential function" was to reduce friction:

> Bourgault attempts to differentiate its coulter disc hub units from automotive hub units, citing to the Commission's report and other scope rulings, which state that the primary purpose of [tapered roller bearings] is to minimize friction and allow for the free rotation of the hub unit. As an initial matter, we disagree that Bourgault's coulter disc hubs do not also fulfill these same criteria. Contrary to Bourgault's assertions, the [tapered roller bearings] in Bourgault's coulter disc hubs allow free rotation of the coulter disc, *under the correct load*, and they facilitate even wear of the bearings, the hub unit, and coulter disc.

Final Scope Ruling at 7. Commerce found that "Bourgault's coulter disc hub . . . allows the coulter disc, which is attached to the plow frame, to turn freely through 360 degrees of motion, while guiding the disc at the prescribed angle." Final Scope Ruling at 7 n.44. It stated: "In this case, the [tapered roller bearings] are free-turning under the proper load, and, like all [tapered roller bearings], they are optimized to resist lateral and shear forces with even and minimal wear." Final Scope Ruling at 8. In other words, although sufficient force is required to overcome the "excess" preload compressing the tapered roller bearings inside the coulter disc hub, the bearings permitted the coulter disc to rotate.

Finding the language of the Order and the (k)(1) sources of information on the record dispositive, Commerce did not consider the factors listed in § 351.225(k)(2). *See* Final Scope Ruling at 6 ("We find that these sources are, together, dispositive as to whether the product at issue is subject merchandise, in accordance with 19 CFR 351.225(k)(1). Therefore, we find it unnecessary to consider the additional factors under 19 CFR 351.225(k)(2)."). This action followed.

## STANDARD OF REVIEW

Commerce's Final Scope Ruling will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

If the language of the Order clearly and unambiguously covers the subject merchandise, the language controls. "The relevant scope terms are unambiguous if they have a single clearly defined or stated meaning." *Meridian Prods.*, 851 F.3d at 1381 n.7 (citation omitted). "[T]he question of whether the unambiguous terms of [the] scope [of an order] control the inquiry, or whether some ambiguity exists, is a question of law" that the court reviews de novo. *Id.* at 1382.

If the order's language is ambiguous, then Commerce "must turn to available [§ 351.225 (k)(1)] sources, including the petition, the initial investigation, and any earlier determinations by Commerce and the [Commission]." *Supreme Inc. v. United States*, 946 F.3d 1300, 1309 (Fed. Cir. 2020) (citations omitted); *see also Atkore Steel Components, Inc. v. United States*, 42 CIT __, __, 313 F. Supp. 3d 1374, 1380 (2018) (citations omitted) ("If . . . the language of the scope order is ambiguous, Commerce more fully analyzes the sources listed in § 351.225(k)(1). Where those sources are dispositive, in other words, the history of the original investigation is clear, Commerce will close the scope ruling proceedings with a 'final scope ruling.'").

Where § 351.225(k)(1) sources are not dispositive, Commerce commences a formal scope inquiry. *See* 19 C.F.R. § 351.225(e). In that case, "Commerce must turn to available [§ 351.225(k)(2)] sources, including the product's physical characteristics, ultimate purchasers' expectations, the product's ultimate use, the channels of trade in which the product is sold, and the

way the product is marketed." *Sunpreme*, 946 F.3d at 1309 (citing *Mid Continent*, 725 F.3d at

1302; 19 C.F.R. § 351.225(k)(2)).


## DISCUSSION

Plaintiff argues that the Final Scope Ruling is legally flawed because Commerce failed to

"take into account" prior agency determinations as required by its regulations. *See* 19 C.F.R.

§ 351.225(k)(1). In particular, Plaintiff claims that Commerce previously interpreted the Order to

include only merchandise that had as its "essential function" the reduction of friction, and that

Commerce failed to apply that "requirement" here. *See* Pl.'s Br. 24. For Plaintiff,

> in-scope [tapered roller bearings] have been defined as products intended to reduce
> friction from the outset of the antidumping duty investigation. That capability is the
> *sine qua non* of the Order's coverage. Merchandise that does not reduce friction
> fails to meet that criterion and is excluded.

Pl.'s Br. 18. Plaintiff relies on excerpts from the New Trend Scope Ruling and Commission reports

to support its claims that in-scope tapered roller bearings' "essential function" is reducing or

minimizing friction. *See* Pl.'s Br. 18-19 (citing New Trend Scope Ruling; ITC Investigation Final

Determination; *Tapered Roller Bearings from China*, Inv. No. 731-TA-344, USITC Pub. 4824

(Sept. 2018) (Fourth Rev.)).

For its part, Defendant maintains that Commerce correctly found that coulter disc hubs are

in-scope based on the plain meaning of the Order:

> Commerce began its analysis with the language of the order, which includes
> "tapered roller housings . . . [and] incorporating tapered rollers." Commerce
> explained that "Bourgault's imported coulter disc hubs meet the physical
> characteristics of [tapered roller bearings] covered by the scope of the order,
> because they are tapered roller housings incorporating tapered rollers, including a
> spindle." Commerce further explained that "there are no exclusions from the
> {order} for merchandise which is subject to a different end use, and, in fact, the
> scope of the order specifically covers all [tapered roller bearings] and tapered roller
> housing[s] (except pillow blocks), 'whether or not for automotive use.'" Commerce

thus determined that Bourgault's coulter disc hubs units "meet the plain language
of the scope."

Def.'s Br. 9-10 (internal citations omitted) (quoting Final Scope Ruling at 7-8).

In addition, Commerce found that coulter disc hubs did, in fact, reduce friction, "under the

correct load." Final Scope Ruling at 7; *see also* Def.'s Br. 12 ("As Commerce explained, contrary

to its assertions, Bourgault's coulter disc hubs *do* serve the purpose of reducing friction and

allowing free movement under the correct load, facilitating even wear of the bearings, the hub unit,

and coulter disc.").

Moreover, Defendant maintains that Commerce satisfied the regulatory requirement to

"take into account" its prior rulings and those of the Commission, including the New Trend Scope

Ruling:

> [In the New Trend Scope Ruling,] Commerce determined that New Trend's wheel
> hub units, which include "two non[-]removable tapered roller bearings in an inner
> race and c[u]p that is machined into the unit's flange, an outer [r]ace machined into
> the assembly forging, and mounting studs for attachment of the assembly to an
> automobile," are "tapered roller housings" within the meaning of the order. . . .
> Commerce reviewed that determination and found that "there is precedent in its
> prior consideration of various tapered roller housing similar to Bourgault's coulter
> disc hubs (also consisting of [tapered roller bearings]) to support a finding that
> Bourgault's coulter disc hubs are within the scope of the Order."

Def.'s Br. 10 (first quoting *Power Train Components*, 37 CIT at 783, 911 F. Supp. 2d at 1341-42;

then quoting Final Scope Ruling at 7).

The court is not persuaded by Plaintiff's argument that Commerce committed legal or

factual error here. First, starting, as it must, with the language of the Order, Commerce found that

the subject coulter disc hubs fell within the plain meaning of the Order, *i.e.*, as they are "tapered

roller housings." *Sunpreme*, 946 F.3d at 1309. Plaintiff does not dispute that "a coulter disc hub's

bearings are imported in a housing." Pl.'s Br. 23. It insists, rather, that the Order's language was

not the "final word" on what it includes. For Bourgault, use of the (k)(1) factors demonstrates that

there is an exception in the Order for its bearings.

Specifically, Plaintiff maintains that Commerce violated its regulations by failing to

adequately consider prior agency rulings that, in Plaintiff's view, established friction reduction as

a *requirement* of the Order. For example, Plaintiff relies on the New Trend Scope Ruling, which

pertained to wheel hub assemblies used in the front wheels of automobiles, both with and without

antilock braking sensors. All of the wheel hub assemblies subject to the scope request incorporated

> two non-removable [tapered roller bearings] in an inner race and cup that are machined into the unit's flange, an outer race machined into the assembly forging, wheel and brake "pilots" for aligning the wheels and brake rotors, and mounting wheel studs. The majority of the assemblies consist of a flanged outer hub with two [tapered roller bearings], into which has been pressed a flanged spindle having a splined inner surface and mounting studs. The wheel hub assemblies are "sealed for life," "greased at factory," and "the bearing preload is set at factory." Certain of the products do not have a splined spindle and certain of the products include [antilock braking sensor] capability. New Trend's wheel hub assemblies may be categorized into the following types of merchandise: (1) splined without [antilock braking sensor] elements; (2) non-splined without [antilock braking sensor] elements; and (3) with [antilock braking sensor] elements.[10]

Preliminary New Trend Scope Ruling at 4.

Before Commerce, New Trend argued that its wheel hub assemblies were outside the scope

of the Order because of additional features and functions, *e.g.*, flanges with wheel and brake pilots,

to align wheel and brake rotors, that went "beyond the antifriction and load bearing capabilities"

---

[10]     Commerce analyzed wheel hub assemblies without antilock braking sensors under 19 C.F.R. § 351.225(k)(1) because it found that (1) the plain language of the Order covered them: "tapered roller housings . . . with or without spindles" (and whether or not the spindles had grooves, *i.e.*, were splined or non-splined); and (2) they were discussed in the ITC Investigation Final Determination. *See* Preliminary New Trend Scope Ruling at 7-8. Although wheel hub assemblies *with* antilock braking sensors were also "tapered roller housings," they were not discussed in the ITC Investigation Final Determination. Thus, Commerce found that it was less clear whether wheel hub assemblies with antilock braking sensors were covered by the Order, and so conducted an analysis of the factors in § 351.225(k)(2).

of covered products. *See* Preliminary New Trend Scope Ruling at 7. Commerce disagreed with

that argument, and found that the additions were not sufficient to take the product outside the

Order.

In the New Trend case, Commerce found that the Order was ambiguous because there,

some of the subject hubs had the additional elements of an antilock braking system—a feature that

was not expressly covered by the Order. Importantly, this ambiguity had nothing to do with the

load of the tapered roller bearings that were part of the hub, excessive or otherwise.

Finding itself unable to resolve this ambiguity using the (k)(1) factors, Commerce went to

the (k)(2) factors. Among the factual findings Commerce made using these factors was that the

ultimate use of the bearings under review was to reduce friction. Thus, while the New Trend Scope

Ruling does observe that: "wheel hub units with additional features and functions retain the

essential function of wheel hub units covered by the Order; that is, they continue to reduce friction[,

and] thus, the additional features found on wheel hub units are engineering and design variations

. . . do not alter the fundamental nature of the subject [tapered roller bearing]," this observation is

in the context of the factual finding that the subject bearings did not differ from other bearings

covered by the Order. *See* Preliminary New Trend Scope Ruling at 7; *see also* New Trend Scope

Ruling at 11 (finding that added functionality did "not alter the wheel hub assemblies' essential

function of reducing friction.").

Here, because the "essential function" language was found in a scope determination using

the factor in (k)(2) based on the "ultimate use of the product," the Department found the New

Trend Scope Ruling irrelevant to its (k)(1) examination. *See* Def.'s Br. 14 (internal citations

omitted) ("Bourgault omits that Commerce determined – and the Court sustained – that 'wheel

hub assemblies with [antilock braking sensor] elements' were within the scope of the order based

on an analysis *under the (k)(2)* factors. Indeed, the language quoted by Bourgault comes from Commerce's analysis of the 'ultimate use of the product.'").

Although Bourgault cites New Trend as adding the requirement that, to be within the scope of the Order, a tapered roller bearing must have the "essential function" of reducing friction, that is not the case. For this kind of requirement to be added, the Order would have to be found to be ambiguous. Ambiguity is a question of law. *See Meridian Prods.*, 851 F.3d at 1382 ("[T]he question of whether the unambiguous terms of [the] scope [of an order] control the inquiry, or whether some ambiguity exists, is a question of law."). While a scope ruling can resolve an ambiguity, it cannot create one. Thus, the New Trend factual finding that two bearings are similar because they reduce friction cannot serve to introduce an ambiguity into the language of the Order as a matter of law.

As to the Commission's report, the report does indeed describe tapered roller bearings as being "a part of the larger product category of antifriction bearings." *See* ITC Investigation Preliminary Determination at A-2. It is included in order to draw a distinction between ball bearings and tapered roller bearings on the basis of tapered roller bearings' ability to "absorb both radial and thrust loads." *See* ITC Investigation Preliminary Determination at A-3. There is no indication that this explanation of the differences in bearings was meant to limit the kinds of tapered roller bearings included in the Order or to add a requirement that to be included in the Order a bearing must have as its essential function the reduction of friction.

As noted, when interpreting the scope of an order, Commerce must start with the plain language of the order itself. *See Mid Continent*, 725 F.3d at 1302. Commerce did not identify an ambiguity in the Order, and there is little to convince the court that Commerce was wrong. Indeed, although Commerce undertook a (k)(1) analysis, it is not clear that Commerce was required to do

so because Bourgault has not shown the Order's language to be ambiguous. Thus, the plain language of the Order controls, and covers Plaintiff's merchandise as "tapered roller housings."

Moreover, even if it could be said that the reduction of friction is an essential function of a tapered roller bearing for it to be found within the scope of the Order, the outcome would be the same. Here, Plaintiff's tapered roller bearings perform two tasks. First, because of their load, they keep the coulter disc rigid and at the proper angle for turning the soil as it is dragged across a field. Second, when sufficient force is applied (when, it can be assumed, the disc hits on an immovable object) the pressure applied by the load is relieved and the bearings turn allowing rotation of the coulter disc. *See* Def.'s Br. 12 (quoting Final Scope Ruling at 5) ("[E]ven though the coulter [tapered roller bearings] do not allow for rotation as fast or reduce friction at the same level as [tapered roller bearings] with different preload settings, they still allow rotation . . . ."); *see also* Final Scope Ruling at 7 ("Contrary to Bourgault's assertions, the [tapered roller bearings] in Bourgault's coulter disc hubs allow free rotation of the coulter disc, *under the correct load*, and they facilitate even wear of the bearings, the hub unit, and coulter disc."). Commerce reached these conclusions as a matter of fact, and Bourgault does not dispute that fact. There being nothing unreasonable about these conclusions, the court finds that substantial evidence supports Commerce's finding that coulter disc hubs reduce friction. *See Sunpreme*, 946 F.3d at 1308 (citations omitted) ("A decision is supported by substantial evidence if the evidence amounts to more than a mere scintilla and a reasonable mind might accept it as adequate to support a conclusion.").

Finally, the court is not convinced that Commerce failed in its duty to "take into account" the information required by its regulations. Subsection 351.225(k)(1) requires that "in considering whether a particular product is included within the scope of an order . . . , [Commerce] will *take*

*into account* . . . [t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of [Commerce] (including prior scope determinations) and the Commission." Although it may have been unnecessary, it is apparent from the Final Scope Ruling that Commerce met that standard. Indeed, it is clear that Commerce did take this information into account, but reached different conclusions in doing so than Bourgault wished. *See Atkore*, 313 F. Supp. 3d at 1380 ("If . . . the language of the scope order is ambiguous, Commerce more fully analyzes the sources listed in § 351.225(k)(1).").

## CONCLUSION

For the reasons stated above, Plaintiff's motion for judgment on the agency record is denied, and the Final Scope Ruling is sustained. Judgment shall be entered accordingly.


                                                        /s/ Richard K. Eaton
                                                    Richard K. Eaton, Judge


Dated:   October 13, 2020
         New York, New York